Date signed April 14, 2011



NANCY V. ALQUIST
U. S. BANKRUPTCY JUDGE

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| In re: | * | |
| | | |
| Horseshoe Point, LLC, | * | Case No. 10-36752-NVA |
| | | (Chapter 11) |
| Debtor | * | |
| | | |
| *    *    *    *    *    *    * | | |
| Lafayette Financial LLC, | | |
| | * | |
| | | |
| Movant, | * | |
| | | |
| v. | * | |
| | | |
| Horseshoe Point, LLC, | * | |
| | | |
| Respondent. | * | |

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

## MEMORANDUM IN SUPPORT OF ORDER
## GRANTING MOTION [dkt. 80] FOR RELIEF FROM
## THE AUTOMATIC STAY IN FAVOR OF LAFAYETTE FINANCIAL LLC

The Court has before it a Motion [dkt. 80] filed by Lafayette Financial LLC (the "Lender") for Relief from Automatic Stay and various related papers. Following an evidentiary hearing held on April 6 - 7, 2011, and based on the evidence presented at the hearing and the record in this case, the Court has determined that cause exists to grant the Lender relief from the

automatic stay.    The Court deems the Lender's concomitant request to compel adequate protection [dkt. 59] moot in light of the granting of relief from stay.[1]

Background

The debtor, Horseshoe Point, LLC (the "Debtor") owns a parcel of land located at 1 Norwood Road, Annapolis, Maryland (the "Property").  The Property was purchased with the intent of building a residence for the principals of the Debtor, Mr. Brian McCormick and Ms. Angela Nagel, his spouse.  The Property is a waterfront parcel on the Severn River.  The Property was purchased with cash; the Debtor obtained financing from the Lender in order to construct the residence.    Before its chapter 11 filing, the Debtor hired a building contractor, Pyramid Builders, Inc. ("Pyramid"), to construct the residence, and to obtain necessary permitting. The Debtor razed the existing structure on the Property, and created on the site an excavation intended to have been the start of the foundation for the future residence. The Debtor ran out of funds.  Building has not commenced, and the excavation has remained on the Property for some time, during which it is at constant risk (if not continually pumped), of filling with water from rains or the adjacent river.

The Debtor hired Pyramid to pump the water from the Property and to build a secant wall in the excavation site.  The secant wall, which was intended to be only temporary, abuts the neighboring residential property (4 Norwood Road) owned by Donald Roland.  The wall is intended to hold back erosion and prevent the shifting of earth in and around the excavation. The Lender, and now the neighbor and the City of Annapolis, have become concerned about the

---

[1] After a hearing conducted on December 22, 2010, and upon motion [dkt.10] of the Lender, the Court entered an order [dkt. 46] Granting Adequate Protection in Favor of Lafayette Financial LLC and Denying Without Prejudice Relief from the Stay.  As part of the hearing on April 6 - 7, 2011, Lafayette sought to enforce the terms of that order.

condition of the secant wall, which they claim has deteriorated and has the potential to shift or collapse, causing damage to the Property and to the neighboring land, house, outbuildings and swimming pool.

<u>The Prior Proceedings</u>

On December 8, 2010, the Lender filed a Motion [dkt. 10] for (I) Adequate Protection and (ii) Relief from Automatic Stay. The Court held a hearing on December 22, 2010 (the "First Lift Stay Hearing"). At the conclusion of the First Lift Stay Hearing, the Court had become convinced that the situation at the Property was precarious, particularly given the Debtor's funding problems. The Debtor had run out of money and could only state that it was actively seeking sources of funding. The excavation would (and will) fill with water from the Severn River if it is not continually pumped out, at a cost of $4,500.00 per week. Because the Debtor was having difficulty obtaining funds for construction of the house, the temporary secant wall had been in place much longer than intended. The wall was starting to degrade and to show signs of wear. Also, the Debtor had received some zoning and construction violation notices from local authorities.

The Court declined to grant stay relief at that juncture, but, noting the precarious situation, issued instead an Order [dkt. 46] Granting Adequate Protection in favor of the Lender (the "Adequate Protection Order"). The Court determined that the Lender's interest was adequately protected as long as the Debtor assured that Pyramid remained on site and continued pumping, and assured that Pyramid continued to monitor the integrity of the retaining wall. The Court also required the Debtor to disclose and remediate the zoning and construction violations and report whether it intended to assume its executory contract with Pyramid. The Court assured

the Lender that it would be heard promptly if the Debtor could not comply with the provisions of the Adequate Protection Order.

<u>The Instant Proceedings</u>

Soon after the entry of the Adequate Protection Order, the Lender became insecure about the steps being taken by the Debtor, suspicious of its financial ability to keep up the measures mandated by the Adequate Protection Order, and concerned about further deterioration of the wall and conditions at the Property. On January 31, 2011, the Lender filed its Motion to Compel [dkt. 59] the Debtor to Comply with the Adequate Protection Order.[2] Subsequently, the Lender also filed its renewed Motion [dkt. 80] for Relief from Stay, seeking to foreclose on its indebtedness and lien.[3] Since the First Lift Stay Hearing, Mr. Roland, the owner of the neighboring property intervened in this case (*see* dkt. [72]), and participated in the lift stay proceeding in support of the Lender.

---

[2] At the original hearing scheduled on the Motion to Compel on February 9, 2011, the parties reported to the Court that they had achieved a settlement and would submit a proposed order for the Court's consideration. This did not happen. Accordingly, the Court held a status conference on the Motion to Compel on March 22, 2011 and took up the Motion to Compel on the merits at the hearing on April 6 - 7, 2011.

[3] The Debtor's indebtedness to the Lender is evidenced by a confessed judgment entered in the Circuit Court of Anne Arundel County, Maryland on or about July 14, 2010 in the approximate amount of $3.2 million. The Lender claims that the total due to it from the Debtor pursuant to the confessed judgment at the time of the First Lift Stay hearing was $3,435,266.27, due to the accrual of interest and attorneys' fees. The Debtor disputes some of the components that make up this total (*e.g.*, the attorneys' fees), and asserts that the total due to the Lender is approximately $3.2 million. The exact present value of the confessed judgment is immaterial - - the Debtor concedes that there is insufficient equity in the Property to secure the full value of the Lender's liens. The Debtor lacks equity in the Property. (At the First Lift Stay Hearing, the Lender presented credible appraisal testimony that the value of the property is $2.24 million) The Debtor has not made any post-petition payments to the Lender, nor does it appear that the Debtor has the present financial wherewithal to do so.

There are two additional secured liens on the Property, both of which are mechanic's liens. One is a mechanic's lien in favor Catherine Purple Cherry Architects in the amount of approximately $169,000 and the other is in favor of Pyramid in the amount of $660,873.47.

The Court conducted a hearing on these matters.  The Lender (and Mr. Roland) took the position that cause exists for relief from stay and that adequate protection has failed because the secant wall is eroding and in danger of failing, the Debtor is out of funds, and the City is considering "pulling" the permits and taking over the site because of erosion dangers.  The Lender called three witnesses - - a geotechnical engineer, an environmental compliance official from the City of Annapolis, and a representative of Pyramid, the builder who constructed the secant wall and who was responsible for the pumping of the excavation.  Based on the evidence presented, as described below, the Court is convinced that adequate protection has failed and that cause exists for granting relief from the stay to the Lender.

A.     *The Geotechnical Engineer*

The Court heard expert testimony from Mr. Ronald Hackman, a geotechnical engineer, with 30 years experience, including experience designing and building retaining walls. The Court found him to be expert and credible in all regards.  Based on a series of photographs of the Property admitted into evidence, Mr. Hackman pointed out numerous places where soil is eroding and emerging through the secant wall, where there are holes in the top of the wall caused by loss of material behind wall, where the mortar has degraded, where the pilings supporting the wall have broken off, and where the wall has become inadequately braced.  *See Lender's Exhibits 2 - 2L.*

Mr. Hackman testified that at one point the retaining wall was probably strong enough to retain the soil behind it, but it is not strong enough anymore.  He said that there are several voids (areas in which there was no dirt or other material) in the wall.  He did not know how far these voids extend back.  He testified that voids create a dangerous situation because once a void is

5

created, other dirt and subsurface material will shift to fill the void.  This process creates movement antithetical to long-term stability.   Mr. Hackman measured an erosion void at the property line of  2 ½ - 3 feet deep.  *See Lender's Exhibit 2K.*   According to Mr. Hackman, in order to assure stability of the site, the erosion needs to be corrected, the voids need to be filled and movement monitoring needs to be done on a regular basis to make sure that whatever remedial measures have been taken are continuing to work. He emphasized that the current wall was intended as only a temporary measure to maintain geotechnical stability pending construction of a permanent wall.[4]   He believes that the current wall is failing, and that the Property is at risk, as is Mr. Roland's adjacent property.

B.      *The City Compliance Inspector*

Robert Savidge, a compliance inspector from the City of Annapolis, testified that, in the City's view, there exists an "emergency situation" on the Property.  This situation is considered an emergency, Mr. Savidge testified, because the condition of the Property is currently threatening the neighboring property.  Mr. Savidge is very familiar with the Property - - he has conducted about 20 inspections of the Property since December, 2010.  The City of Annapolis already has issued a field correction notice with respect to the Property because there was evidence of erosion along the property line between 1 Norwood Road and 4 Norwood Road, and because there was evidence that due to erosion, material was coming through the secant wall. *See Lender's Exhibit 4.*  Mr. Savidge thought that this situation had been resolved by the addition of some plywood to the site, but upon re-inspection of the Property, he determined that

---

[4]  What is clear from looking at the pictures introduced into evidence, but may not be as clear from the testimony, is that the neighboring property, 4 Norwood Court, sits at a slightly higher elevation than the Property.

the erosion continued to exist.   His inspection revealed cracks in the pool deck at 4 Norwood, and sink holes (evidence of voids).

On January 28, 2011, the City of Annapolis issued a letter to the Debtor that an "emergency situation" existed at the Property, that it had determined that the temporary secant wall was "failing," that there was an "unsafe working condition" at the Property and that the situation had created a "hazard" for Mr. Roland's property. *See Lender's Exhibit 6*.   The City ordered the Debtor to construct a permanent wall by March 15, 2011.   The City also threatened a daily fine of $1,000 and further compliance action.   *Id*.

In response to this letter, the Debtor replied to the City and proposed its own timetable, essentially pushing out deadlines and promising to undertake specific work by specific dates. *See Lender's Exhibit 7*.   For example, the Debtor proposed that by February 21, 2011 it would fill the remaining voids in the secant wall with grout, that it would begin construction on the main house foundation on February 14, 2011, and that it would build "continuously and aggressively" until completed.   It also proposed to construct a permanent wall immediately upon completion of the main house foundation.   *See id*.   As of the date of the hearing, none of this had been undertaken.   Mr. Savidge testified that the emergency condition still exists.   The City has determined that the erosion condition has not been remediated.   It is requiring that the Debtor take immediate action to fix the existing secant wall or construct the permanent structures for which permits have been issued.

In this regard, Mr. Savidge testified that the owner of the Property has been issued a grading permit, a building permit and two demolition permits.   He said that, if an emergency situation continues to exist at the Property, it is possible, if not likely, that the permits will be

withdrawn be the City of Annapolis. He reported that the City is considering taking such action as soon as within the next week or so.

C.   *The Builder*

The principal of Pyramid Builders, Bret Anderson, also testified. Mr. Anderson is in an unhappy position. The Debtor owes Pyramid approximately $840,000. Mr. Anderson's best hope to recoup what is owed is to go forward with the planned construction for which he and the architect have secured the permits. In order to do that, of course, the Property must remain stabilized by continued pumping. Accordingly, Mr. Anderson and his crew have remained on the Property and have continued to operate the pumps. He is willing to continue to perform this function, at least through April 30, 2011, in the interest of retaining the permits. All of the parties appear to be of the opinion that once the permits are pulled by the City of Annapolis, the Property will be far less valuable. As it stands, the Property is "grandfathered" to permit construction of a larger residence than would otherwise be possible. For this reason, Mr. Anderson feels that he has an investment stake, of sorts, in the Property and, so far at least, has been willing to be flexible with his arrangements.[5]

Mr. Anderson testified that he did not give a close enough inspection to know if there was erosion occurring, but he did see some cracked concrete, although he did call this "somewhat normal." He testified that he and his crew could make the needed repairs to the

---

[5] Upon examination by the Debtor, Mr. Anderson testified that he would consider being paid through a "surcharge" on the Lender's collateral (a device sometimes made available in bankruptcy proceedings).

secant wall in 8 - 10 working days at a cost of about $800 - $1200 per day.  He also reported that none of the work outlined in the Debtor's letter to the City of Annapolis had been undertaken.

D.    *The Debtor's Response*

For the its part, the Debtor argues that it is in compliance with the Adequate Protection Order because Pyramid is continuing to pump for approximately the next month, at least, and Pyramid is continuing to monitor the structural integrity of the wall. The Debtor conceded that it is having some trouble finding funding for its construction project.  The Debtor proposed at the hearing, apparently for the first time, that it might opt to list and sell the Property rather than build the intended residence.    The Debtor's sole witness on these points was the Debtor's principal, Mr. Brian McCormick.  The Debtor did not present any expert testimony.

The Debtor introduced a photograph of the Property and secant wall that had been taken approximately two weeks after the Lender's photographs.  The Debtor attempted to show through this photograph that there had been no discernable change in the appearance of the Property during this time period, even though it had rained at least once during this time.   The Court was not convinced, in substantial part because Mr. Hackman, the Lender's geotechnical engineer, had made the point that it is not possible to look at a single point in a single photograph and conclude that based on that particular location, that the secant wall is holding and is structurally sound.  Mr. Hackman also made the point that the lack of visible erosion from one rain event is not a sign that erosion is not occurring or will not occur.  He testified that the risk of erosion varies with the significance of a  rain event.  For example, a heavy rain in a short period of time will cause significant erosion which will cause loss of material and land

movement and could ultimately cause a house to move.   For these reasons, the Debtor's position with respect to condition of the secant wall and the erosion was not persuasive.


## Conclusions

 The Lender has established that it is entitled to relief from stay because: (I) there is an obligation owed from the Debtor to the Lender, (ii), the Lender holds a valid security interest and (iii) cause exists to lift the stay because the Lender's interest is not adequately protected.  11 U.S.C. § 362 (d) (1); *In re Harrington*, 282 B.R. 637 (Bankr. S.D. Ohio 2002).  *See also, In re ASI Activation*, 934 F.2d 1315 (4th Cir. 1991) (lack of adequate protection of a creditor's interest is adequate grounds to lift the automatic stay).   A Court may also lift the stay to prevent irreparable damage to property.  *In re Mullins*, 877 F.2d 60 (4th Cir. 1989).

 All of the credible evidence suggests that the secant wall is failing, that the Property is in precarious condition, and that its value may be diminishing.   Mr. Hackman, the only geotechnical engineer who testified in this case, gave his opinion that erosion is occurring and the wall is failing.  The land at the higher levels will continue to move to fill in voids left at a lower level. The City of Annapolis believes that the Property is in a state of emergency and that a hazardous and dangerous condition exists.  Even if the City of Annapolis were to be satisfied with the Debtor's making repairs to the secant wall (and there is no evidence that it would), there is no evidence that the Debtor has even the bare minimum of funds that would be required to make these repairs.  And this would be only a temporary fix.  The secant wall was never meant to be a permanent structure.  It was merely meant to be a temporary fix while the residence was being constructed.

10

There is also the risk that the City of Annapolis may soon invalidate the permits issued with respect to the Property.  The City is considering doing this as soon as within the next week or so. The parties seem to agree that if the permits remain in place and if the Lender is able to sell or develop the Property using the same builder and the same architect, the value of the Property as it stands with the existing permits may remain intact.    The Lender is willing to continue to pump and to build a permanent wall in order to preserve the value of the Property. In consideration of the foregoing, and because the Debtor has not made (and appears to be unable to make) any post-petition payments, and there is no equity in the Property, cause exists for the stay to be lifted.

A separate order will issue.

CC:

Paul M. Sweeney, Esquire
Logan, Yumkas, Vidmar & Sweeney LLC
2530 Riva Road, suite 400
Annapolis, MD  21401

John C. Armstrong, Esquire
McGuireWoods LLP
7 Saint Paul St., suite 1000
Baltimore, MD 21201

Kenneth M. Misken, Esquire
McGuireWoods LLP
1750 Tysons Blvd, suite 1800
McLean, VA 22102

Robert A. DePont, Esquire
140 South Street
P.O. Box 386
Annapolis, MD 21404


Office of the United States Trustee
101 W. Lombard St.  rm. 2625

11

Baltimore, MD  21201

**END OF MEMORANDUM**